**Case No. 19-4172**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**UNITED STATES OF AMERICA**
Plaintiff-Appellee

vs.

**WILLLIAM WHEAT**
Defendant-Appellant

*On Appeal from the United States District Court*
*for the Northern District of Ohio*

**BRIEF OF APPELLANT**

STEPHEN ROSS JOHNSON
*RITCHIE, DILLARD, DAVIES & JOHNSON, P.C.*
606 W. Main St., Suite 300
Knoxville, Tennessee 37902
(865) 637-0661
johnson@rddjlaw.com

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................................x

STATEMENT OF JURISDICTION...........................................................................1

STATEMENT OF THE ISSUES................................................................................2

I. THE SUPERSEDING INDICTMENT WAS INSUFFICIENT BECAUSE IT FAILED TO STATE THE ELEMENTS OF THE OFFENSE AND WAS UNLAWFULLY AMENDED. ....................................................................2

II. MR. WHEAT'S CONVICTIONS SHOULD BE VACATED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.................2

III. MR. WHEAT'S SENTENCE SHOULD BE VACATED BECAUSE THE SENTENCING PROCEDURES WERE CONSTITUTIONALLY AND STATUTORILY INADEQUATE................................................................2

STATEMENT OF THE CASE....................................................................................3

I. PROCEDURAL HISTORY ...........................................................................3

    A. Mr. Wheat was jointly charged with several co-defendants in a single drug conspiracy. ..............................................................................3

    B. Mr. Wheat was sentenced to twenty-seven months in prison..............4

II. STATEMENT OF FACTS.............................................................................5

    A. Co-defendant Aaron Reels was the focus of a prolonged drug investigation. ...................................................................................5

    B. The government's case revolved around the six-month investigation of Mr. Reels, who was not on trial. ........................................................5

        **i.** Officer Daniel Lajack testified about the internal systems of large-scale operations and the Reels investigation. ....................5

1. The DEA tracked Mr. Reels's drug activity through a wiretap. ...................................................................6

    a. Mr. Reels repeatedly asked Mr. Mileca to use drug samples and compare their quality. ........................ 7

    b. Mr. Reels vaguely discussed drug supply with Mr. Williams. .............................................. 9

    c. Mr. Wheat sent Mr. Reels his phone number and they arranged a meeting at a gas station............... 9

2. The DEA seized heroin, fentanyl, and cocaine from Mr. Reels during the execution of search warrants. ..............11

3. The DEA did not conduct any independent investigation of Mr. Wheat...................................................11

**ii.** Sergeant Dennis Lally identified Mr. Wheat by executing a traffic stop after he left the Circle K. .......................................11

**iii.** Aaron Reels testified about his drug distribution scheme. .......12

1. Mr. Reels barely knew Mr. Wheat, and there was no preexisting business relationship between them. ...........12

**iv.** DEA Agent Heather Grimes testified about the Reels investigation and Mr. Wheat's limited involvement. ...............13

**v.** Law enforcement executed search warrants and seized large quantities of heroin, cocaine, and fentanyl from Mr. Reels's "stash" apartment, but Mr. Wheat did not know about or provide any of the seized drugs to Mr. Reels........................................14

C. At the close of evidence at trial, the quantity of drugs element was removed from the Superseding Indictment before being submitted to the jury...................................................................15

D. At sentencing, the district court further amended the Superseding Indictment to alter the charged drug offense from a "purchase" by Reels from Wheat to a "receipt" by Reels – an after the fact impermissible conformance of the charges to fit the government's theory that allowed

the government to focus its sentencing evidence on Mr. Wheat's potential culpability. ...............................................................................16

    **i.** DEA Agent Rande Reinhard testified that Mr. Wheat was highly culpable because he could have supplied a large quantity of drugs. ......................................................................................16

    **ii.** The court assumed the quantity of heroin that Mr. Wheat would have sold to Mr. Reels. ..........................................................18

    **iii.** The parties argued about the appropriate criminal offense level under the sentencing guidelines. ............................................19

SUMMARY OF THE ARGUMENT ....................................................................21

ARGUMENT .........................................................................................................23

III.   THE SUPERSEDING INDICTMENT WAS INSUFFICIENT BECAUSE IT FAILED TO STATE THE ELEMENTS OF THE OFFENSE AND WAS UNLAWFULLY AMENDED. ........................................................................23

   A.   The Superseding Indictment does not state all the elements. .............23

    **i.** The superseding indictment does not allege all the elements of a conspiracy. .......................................................................24

    **ii.** The failure of the Superseding Indictment to sufficiently allege all the elements of conspiracy is a error that violated Mr. Wheat's right to know the charges against him. ...................................25

   B.   The Superseding Indictment was unlawfully amended at trial and at again sentencing. .........................................................................26

    **i.** The allegations in the Superseding Indictment were amended at the close of proof at trial and again during sentencing. ............27

      1.   The court removed the drug quantity element from the charges to comply with the government's proof and materially changed the charges against him. ..................27

      2.   At sentencing, the allegations were amended to indicate that Mr. Reels did not purchase drugs from Mr. Wheat. 28

ii.     There is a fatal variance between the number of conspiracies alleged in the Superseding Indictment and that shown at trial. 29

IV.    MR. WHEAT'S CONVICTIONS SHOULD BE VACATED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE. .............. 34

     A.     There was insufficient evidence showing that a conspiracy existed...35

         i.     At most, the government's proof established a potential buyer-seller relationship between Mr. Wheat and Mr. Reels, which is insufficient to prove a criminal conspiracy............................. 35

         ii.     Even if there was a single conspiracy, there is insufficient evidence that Mr. Wheat knowingly and voluntarily joined that conspiracy. ................................................................. 38

     B.     There is insufficient evidence that Mr. Wheat possessed heroin with intent to distribute.................................................................. 39

     C.     Mr. Wheat's conviction for use of a communication facility in furtherance of a drug trafficking crime is not supported by sufficient evidence. ................................................................. 40

V.    MR. WHEAT'S SENTENCE SHOULD BE VACATED BECAUSE THE SENTENCING PROCEDURES WERE CONSTITUTIONALLY AND STATUTORILY INADEQUATE.................................................. 41

     A.     Mr. Wheat's sentence is procedurally unreasonable because the court's guidelines determination was erroneously rooted in a quantity of drugs that was not supported by a preponderance of the evidence............... 43

     B.     Mr. Wheat's sentence is substantively unreasonable because the sentencing court misconstrued the § 3553(a) factors when applying the upward variance. ................................................................. 45

         i.     The sentencing court misused Mr. Wheat's juvenile record to support its finding that his criminal history was understated. ..46

         ii.     The court's concern for sentencing disparity is unwarranted and lead to an erroneous result. ................................................ 48

CONCLUSION .................................................................. 51

CERTIFICATE OF COMPLIANCE.......................................................................52

CERTIFICATE OF SERVICE ............................................................................53

ADDENDUM ...................................................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Abuelhawa v. United States*, 556 U.S. 816 (2009) .....................................................40

*Gall v. United States*, 552 U.S. 38 (2007) ..................................................... 41, 42, 43

*Hamling v. United States*, 418 U.S. 87 (1974) .........................................................23

*In re Agler*, 249 N.E.2d 808 (1969) ...........................................................................46

*Jackson v. Virginia*, 443 U.S. 307 (1979) ..................................................................34

*Johnson v. United States*, 520 U.S. 461 (1997) ........................................................24

*Kline v. TVA*, 128 F.3d 337 (6th Cir. 1997) ...............................................................45

*Kotteakos v. United States*, 328 U.S. 750 (1946) ......................................... 31, 32, 33

*Martin v. Kassulke*, 970 F.2d 1539 (6th Cir. 1992) ............................................ 26, 27

*Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016) .....................................24

*State v. Hand*, 149 Ohio St. 3d 94 (Ohio 2016) ........................................................46

*United States v. Anderson*, 605 F.3d 404 (6th Cir. 2010) .........................................23

*United States v. Anderson*, 89 F.3d 1306 (6th Cir. 1996) .........................................36

*United States v. Baker*, 521 F. App'x 371 (6th Cir. Mar. 29, 2013) ................ 41, 42

*United States v. Baker*, 905 F.2d 1100 (7th Cir. 1990) .............................................36

*United States v. Ballard*, 86 F. App'x 886 (6th Cir. Jan. 27, 2004) ........................45

*United States v. Barrow*, 118 F.3d 482 (6th Cir. 1997) ...........................................29

*United States v. Blackwell*, 459 F.3d 739 (6th Cir. 2006) ................................. 30, 33

*United States v. Bolds*, 511 F.3d 568 (6th Cir. 2007) ...............................................41

*United States v. Bras*, 483 F.3d 103 (D.C. Cir. 2007) ..............................................49

*United States v. Budd*, 497 F.3d 517 (6th Cir. 1986) ...............................................26

*United States v. Carmichael*, 676 F. App'x 402 (6th Cir. Jan. 13, 2017) ...............49

*United States v. Carson*, 560 F.3d 566 (6th Cir. 2009) .............................................34

*United States v. Carver*, 470 F.3d 220 (6th Cir. 2006).............................. 25, 26, 38

*United States v. Castro*, 2020 U.S. App. LEXIS 17533 (6th Cir. June 3, 2020) .. 36, 43

*United States v. Chillingirian*, 280 F.3d 704 (6th Cir. 2002) ..................................26

*United States v. Cole*, 59 F. App'x 696 (6th Cir. 2003) ................................... 35, 36

*United States v. Combs*, 369 F.3d 925 (6th Cir. 2004).................................... 26, 27

*United States v. Conatser*, 514 F.3d 508 (6th Cir. 2008) .......................................49

*United States v. Cotton*, 535 U.S. 625 (2002) ........................................................24

*United States v. Davy*, 433 F. App'x 343 (6th Cir. 2011) .......................................42

*United States v. Deitz*, 577 F.3d 672 (6th Cir. 2009)................................. 35, 36, 37

*United States v. DeZard*, 157 F.3d 1042 (6th Cir. 1998).........................................23

*United States v. Gibbs*, 182 F.3d 408 (6th Cir. 1999) .............................................25

*United States v. Gibson*, 513 F.2d 978 (6th Cir. 1975) ...........................................24

*United States v. Hart*, 640 F.2d 856 (6th Cir. 1981) ........................................ 23, 24

*United States v. Henley*, 360 F.3d 509 (6th Cir. 2004)............................................36

*United States v. Herrera*, 757 F.2d 144 (7th Cir. 1985).........................................36

*United States v. Houston*, 529 F.3d 743 (6th Cir. 2008) .........................................49

*United States v. Hynes*, 467 F.3d 951 (6th Cir. 2006) ......................... 26, 27, 29, 30

*United States v. Koenig*, 856 F.2d 843 (7th Cir. 1988) ...........................................35

*United States v. Lanning*, 633 F.3d 469 (6th Cir. 2011)............................. 41, 42, 43

*United States v. Lawrence*, 557 F. App'x 520 (6th Cir. 2014)................................23

*United States v. Mancillas*, 580 F.2d 1301 (7th Cir. 1978)......................................35

*United States v. Mize*, 814 F.3d 401 (6th Cir. 2016) ................................. 31, 32, 33

*United States v. Muhammad*, 2019 U.S. App. LEXIS 17425 (6th Cir. June 10, 2019) ......................................................................................................................46

*United States v. Norman*, 391 F.2d 212 (6th Cir. 1968).........................................24

*United States v. Olano*, 507 U.S. 725 (1993) .........................................................24

*United States v. Presley*, 547 F.3d 625 (6th Cir. 2008)...........................................43

*United States v. Pritchett*, 749 F.3d 417 (6th Cir. 2014) ................................. 34, 36

*United States v. Pruitt*, 156 F.3d 638 (6th Cir. 1998)...................................... 43, 44

*United States v. Simmons*, 501 F.3d 620 (6th Cir. 2007).........................................49

*United States v. Slayton*, 366 F. App'x 650 (6th Cir. Feb. 25, 2010).....................40

*United States v. Solis-Bermudez*, 501 F.3d 882 (8th Cir. 2007)..............................42

*United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008).........................................30

*United States v. Thomas*, 49 F.3d 253 (6th Cir. 1995) ...........................................44

*United States v. Walton*, 908 F.2d 1289 (6th Cir. 1990) .........................................44

*United States v. Watts*, 519 U.S. 148 (1997) ..........................................................43

*United States v. Williams*, 29 F. App'x 198 (6th Cir. 2001) ..................................43

## Other Authorities

6th Cir. R. 34(a) .........................................................................................................x

Courtney Fain, *Note: What's in a Name? The Worrisome Interchange of Juvenile "Adjudications" with Criminal "Convictions"*, 49 B.C. L. Rev. 495, 498 (March 2008).........................................................................................................................47

Fed. R. App. P. 32(a)(7).............................................................................................52

Fed. R. App. P. 32(a)(7)(C) .......................................................................................52

Fed. R. App. P. Rule 3 ...................................................................1

Fed. R. App. P. Rule 4 ...................................................................1

Fed. R. Crim. P. Rule 12(b)(3)(B) ...............................................23

Fed. R. Crim. P. Rule 7(c)(1) ........................................................23

Fed. R. Evid. 801 .........................................................................39

**<u>Constitutional Provisions</u>**

18 U.S.C. § 3231 ...........................................................................1

18 U.S.C. § 3553(a) ............................................................... 42, 46

18 U.S.C. § 3553(e) .....................................................................48

Ohio Rev. Code Ann. § 2151.022 (LexisNexis 1999)..................48

U.S. Const. amend. V............................................................ 23, 26, 29

U.S. Const. amend. VI ..................................................... passim

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant-Appellant William Wheat respectfully requests oral argument pursuant to Sixth Circuit Rule 34(a). Mr. Wheat believes that oral argument would assist the Court in addressing the legal arguments raised in this appeal. This case involves important legal issues concerning the reach of criminal conspiracy and an upward variance by the district court at sentencing. Oral argument will be helpful in clarifying any questions the Court may have about the legal issues and underlying factual background and may assist the Court in reaching its decision.

## STATEMENT OF JURISDICTION

This matter concerns an appeal as of right in a criminal case by the defendant pursuant to Fed. R. App. P. 3 and 4 from a final judgment of the United States District Court for the Northern District of Ohio at Youngstown, in which he was sentenced to 27 months imprisonment. (Judgment, R. 204.) The district court entered the judgment on November 19, 2019. (*Id.*) The defendant timely filed a notice of appeal on November 29, 2019. (Notice of Appeal, R. 208.) The district court had jurisdiction to hear allegations of violations of federal criminal statutes pursuant to 18 U.S.C. § 3231.

## STATEMENT OF THE ISSUES

**I.**     **THE SUPERSEDING INDICTMENT WAS INSUFFICIENT BECAUSE IT FAILED TO STATE THE ELEMENTS OF THE OFFENSE AND WAS UNLAWFULLY AMENDED.**

**II.**     **MR. WHEAT'S CONVICTIONS SHOULD BE VACATED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.**

**III.**     **MR. WHEAT'S SENTENCE SHOULD BE VACATED BECAUSE THE SENTENCING PROCEDURES WERE CONSTITUTIONALLY AND STATUTORILY INADEQUATE.**

## STATEMENT OF THE CASE

### I.   PROCEDURAL HISTORY

Mr. Wheat appeals the judgment of the district court in which, following a jury trial, he was convicted of conspiring to distribute controlled substances and using a communication facility in furtherance of a drug trafficking crime. (Verdict, R. 127, Page ID ## 772 – 773.)

#### A.   Mr. Wheat was jointly charged with several co-defendants in a single drug conspiracy.

An Indictment was issued against co-defendant Aaron Reels on May 23, 2018. (Indictment, R. 8, Page ID ## 42 – 43.) A Superseding Indictment was filed on December 12, 2018 which added several counts and named seven defendants, including Mr. Wheat. (Superseding Indictment, R. 21, Page ID # 78.)

Count 1 charges all defendants with conspiring "to possess with intent to distribute and to distribute a mixture or substance containing a detectable amount of cocaine, heroin, carfentanil, and fentanyl." (*Id.* at Page ID # 78.) It alleges that Mr. Wheat conspired with Mr. Reels, Mr. Williams, and Mr. Mileca to distribute "at least 100 grams or more of a mixture or substance containing a detectable amount of heroin [...] and 40 grams or more of fentanyl[.]" (*Id.* at Page ID # 79.) The defendants were also charged with using telephones to facilitate drug activity and frequently changing their phone numbers. (*Id.* at Page ID # 79 – 80.)

All other defendants pleaded guilty and waived their right to jury trial. (Williams J., R. 131, Page ID # 789; Short J., R. 182, Page ID # 1295; Bell J., R. 184, Page ID # 1306; Thompson J., R. 189, Page ID # 1342; Reels J., R. 197, Page ID # 1320; Mileca J., R. 206, Page ID # 1526.)

Mr. Wheat moved for Judgment of Acquittal during and after trial. (Trial Tr., R. 227, Page ID ## 2432 – 2435; Sealed Mot. for a J. of Acquittal, R. 138, Page ID ## 809 – 811; Sealed Gov. Opp'n to Def. Mot. for J. of Acquittal, R. 162, Page ID # 1072; Sealed Def. Reply to Gov. Opp'n to Def. Mot. for J. of Acquittal, R. 176, Page ID ## 1205 – 1206; Sealed Mem. & Order, R. 200, Page ID ## 1453 – 1459.) The motion was denied because "[t]he evidence was sufficient to establish the crucial element of an agreement to support a criminal conspiracy conviction." (Mem. Op. & Order Den. Sealed Mot., R. 200, Page ID # 1459.)

**B.      Mr. Wheat was sentenced to twenty-seven months in prison.**

The probation office filed a Presentencing Investigation Report ("PSR") which calculated a level 12 base offense level and category 1 criminal history for Mr. Wheat. (Sealed Presentence Investigation Report Revised, R. 199, Page ID ## 1437, 1440.) On November 19, 2019, however, the district court varied upward to provide Mr. Wheat a sentence of 27 months in prison, followed by three years of supervised release. (J. Criminal Case, R. 204, Page ID ## 1516 – 1517.)

## II. STATEMENT OF FACTS

### A. Co-defendant Aaron Reels was the focus of a prolonged drug investigation.

Mr. Reels was investigated by the Drug Enforcement Agency (DEA) in Cleveland, Ohio, for six months, beginning in October 2017. (Lajack Test., Trial Tr., R. 226, Page ID # 2254.) For only two days in February 2018, William Wheat appeared in the investigation. The DEA recorded three phone calls where Mr. Wheat and Mr. Reels purportedly arranged a drug deal. (Lajack Test., Trial Tr., R. 226, Page ID # 2289 – 92, 2294; Ex. List, R. 125, Page ID # 769 – 770, Ex. 14 – 16.) Mr. Wheat allegedly gave Mr. Reels a sample of heroin. (Lajack Test., Trial Tr., R. 226, Page ID # 2293.) Mr. Reels gave the drugs to Carl Mileca to test its quality. (*Id.* at Page ID ## 2296 – 2297.) Mr. Wheat and Mr. Reels did not speak again.

### B. The government's case revolved around the six-month investigation of Mr. Reels, who was not on trial.

The trial revolved around the mechanics of Mr. Reels's drug operation. Mr. Reels's guilt was repeatedly put on display by the government witnesses. In contrast, the evidence against Mr. Wheat was slim.

#### i. Officer Daniel Lajack testified about the internal systems of large-scale operations and the Reels investigation.

Officer Lajack testified that he investigates drug crimes as a task force officer with the Cleveland DEA. (*Id.* at Page ID # 2218 – 2219.) He explained the mechanics

of drug distributorships and provided context for some of the terminology. Importantly, he clarified the meaning of "dope sick" and use of drug samples.

"Dope sick" is slang for heroin withdrawal. (*Id.* at Page ID # 2234 – 35.) Being dope sick is like "having the flu a hundred times more than just the normal flu[.]" (*Id.* at Page ID # 2234.) Addicts can "cure" their withdrawal by taking more heroin, which "allows them to function throughout their day." (*Id.*)

Drug supply sources sometimes provide dealers with a sample of their product to convince the dealer to buy a larger quantity of drugs to distribute. (*Id.* at Page ID # 2233.) The dealer then gives the sample to a drug user to test and report back on its quality. (*Id.* at Page ID ## 2233 – 34.) The quality is measured by the length of the high. (*Id.* at Page ID # 2234)

### 1. The DEA tracked Mr. Reels's drug activity through a wiretap.

The DEA used a wiretap on Mr. Reels's telephone to monitor his drug dealing and identify other players in his distribution ring. (*Id.* at Page ID ## 2238 – 2241.) Sixteen of these calls were introduced at trial, three of which included Mr. Wheat. (*Id.* at Page ID ## 2268 – 2302.) Most of the remaining calls were discussions between Mr. Reels and Mr. Mileca comparing drug samples. (*Id.*) A significant amount of testimony was dedicated to drug deals that Mr. Wheat did not know about. (*Id.*; Parties Stipulations of Fact, R. 129, Page ID ## 778 – 781.)

### a. Mr. Reels repeatedly asked Mr. Mileca to use drug samples and compare their quality.

The government entered several recorded phone calls as exhibits through Officer Lajack. (Lajack Test., Trial Tr., R. 226, Page ID ## 2267 – 2299.) In the calls, Mr. Mileca and Mr. Reels use a numbered grading scale to compare heroin samples. (Lajack Test., Trial Tr., R. 226, Page ID # 2278.) Officer Lajack opined that the repetitive sampling indicated that Mr. Reels was "shopping around for heroin" to find the highest quality drug for the money. (*Id.* at Page ID # 2280.)

One of the metrics for quality is whether the drug is cut with other substances and if it needs to be cooked. To prepare heroin for injection, the user will cook it by putting the heroin in a spoon with water and heating "the bottom of the spoon with a lighter" until it boils and breaks down into a syrup that is then injected. (Lajack Test., Trial Tr., R. 226, Page ID ## 2272 – 2273.) High quality heroin will dissolve quickly in water without being cooked. (*Id.*) Heroin is often cut with other drugs to stretch its quantity, which dilutes the actual heroin. (*Id.* at Page ID ## 2275 – 2276.)

On February 15, 2018 at 9:34 PM, Mr. Reels called while Mr. Mileca was sick in bed. (Ex. List, R. 125, Page ID # 768, Ex. 1.) Mr. Reels asked him "to check something out" and meet him at Slim and Chubby's. (*Id.*) Mr. Reels followed-up that night at 11:49 PM. (*Id.* at Ex. 2.) Mr. Mileca said it was terrible and did not cure his dope sickness. (*Id.*) Mr. Mileca refused another sample of heroin because he was going to bed for the night. (*Id.*)

On February 16th at 4:35 PM, Mr. Mileca reported another low-quality sample to Mr. Reels. (*Id.* at Ex. 3.) The heroin was cut with other drugs and had to be "cooked" before it could be taken. (*Id.*)

Mr. Reels offered to give Mr. Mileca heroin to test "real quick" on February 20th at 3:25 PM. (Ex. List, R. 125, Page ID # 768, Ex. 4.) They agreed to meet immediately. (*Id.*) At 4:32 PM, Mr. Mileca rated the heroin at "about an eight" and said that people would buy it. (*Id.* at Ex. 5.) The heroin had some cut but would cure dope sickness. (*Id.*) The heroin dissolved "right up" and did not need to be cooked. (*Id.*) Mr. Mileca noted that Mr. Reels's "normal" was a nine and much better, but people would still purchase the eight. (*Id.*) At 9:04 the next morning, Mr. Mileca maintained that the heroin was an eight because it "held good." (Ex. List, R. 125, Page ID # 769, Ex. 6.) A drug's "hold" refers to how long the high lasts. (Lajack Test., Trial Tr., R. 226, Page ID # 2281 – 2282.)

On February 22nd around 11:40 AM, Mr. Reels asked Mr. Mileca to test another sample of heroin. (*Id.* at Ex. 8.) An hour later, he rated it at a "six or seven" and said that it was not nearly as good as the previous sample. (*Id.* at Ex. 9.)

At 9:45 PM on February 26th, Mr. Reels again offered Mr. Mileca heroin, which he declined because he was in bed for the night. (*Id.* at Ex. 10.) Mr. Reels immediately called him back to pick up the drugs. (*Id.* at Ex. 11.) Mr. Reels's car was blocked in by the police and he wanted the drugs out of his car. (*Id.*) They agreed

to meet. (*Id.*) Mr. Reels was pulled over in the convenience store by a Cleveland Police officer for something unrelated to the DEA investigation. (Lajack Test., Trial Tr., R. 226, Page ID # 2285.) At 11:21 the next morning, Mr. Mileca rated the sample highly and said that it was better than the "brown shit" he took before. (Ex. List, R. 125, Page ID # 769, Ex. 12.)

### b. Mr. Reels vaguely discussed drug supply with Mr. Williams.

At 11:11 AM on February 22nd, Mr. Reels called Mr. Williams and asked if "shit been checking yet." (Ex. List, R. 125, Page ID # 769, Ex. 7.) Mr. Williams said "not on your one side" but hoped it would soon change. (*Id.*) They agreed to meet in person to discuss things further. (*Id.*) Mr. Reels wanted to know if Mr. Williams had a heroin supplier. (Lajack Test., Trial Tr., R. 226, Page ID # 2283.) On February 27th, Mr. Williams reported that his customers said that Mr. Reels's heroin was bad, "real weak" and "a zero." (Ex. List, R. 125, Page ID # 769, Ex. 13.)

### c. Mr. Wheat sent Mr. Reels his phone number and they arranged a meeting at a gas station.

At 10:43 PM on February 27th, Mr. Reels called Mr. Wheat because he had "inboxed" his phone number through social media. (*Id.* at Ex. 14.) Mr. Wheat said that he "came across something" in "the restoration field" that "ain't be played around with." (*Id.*) They agreed to meet the next day around 11:00 AM. (*Id.*) At 10:55 the next morning, Mr. Reels called to confirm their meeting at a Circle K gas

station near 140th. (*Id.* at Ex. 15.) Mr. Wheat called to confirm about twenty minutes later. (*Id.* at Ex. 16.)

The DEA conducted surveillance at the gas station. (Lajack Test., Trial Tr., R. 226, Page ID # 2295.) Afterward, a Cleveland Police officer pulled over Mr. Wheat's car to identify him. (*Id.*)

Mr. Reels called Mr. Mileca at 11:33 AM and offered him something "to check out." (Ex. List, R. 125, Page ID # 770, Ex. 17.) Mr. Mileca agreed to meet him on Triskett Street, where the Circle K is located, and follow him elsewhere. (*Id.*)

Forty-five minutes later, Mr. Mileca said that the drug was just below the last sample. (*Id.* at Ex. 18.) "Yesterday's" got Mr. Mileca "nodding" because he "really felt it." (*Id.*) The nodding indicates that the drug was very strong and Mr. Mileca was likely close to an overdose and becoming lethargic. (Lajack Test., Trial Tr., R. 226, Page ID # 2298.)

Mr. Mileca said that the current drug looked good, did not have any cut in it, and was a good color. (Ex. List, R. 125, Page ID # 770, Ex. 18.) Heroin is ideally in "chunk form" because it looks like it came "right off a kilo" and is "more pure rather than all powdery" without cutting agents. (Lajack Test., Trial Tr., R. 226, Page ID # 2299.)

### 2. The DEA seized heroin, fentanyl, and cocaine from Mr. Reels during the execution of search warrants.

The DEA executed search warrants on three of Mr. Reels's properties and seized 319 grams of heroin, 200 grams of a heroin-fentanyl mixture, and 138 grams of cocaine. (*Id.* at Page ID # 2303.)

### 3. The DEA did not conduct any independent investigation of Mr. Wheat.

The DEA's investigation into Mr. Wheat was limited to the phone calls and the gas station meeting. (*Id.* at Page ID # 2313.) Mr. Wheat was never the focus of an investigation. (*Id.*) The DEA did not confirm the substance the government sought to attribute to Mr. Wheat was, in fact, contraband or the amount of Mr. Wheat's purported sample. (*Id.* at Page ID # 2315.) No evidence suggests that Mr. Wheat knew about the other defendants. (*Id.* at Page ID # 2315 – 2316.) Mr. Reels never purchased drugs from Mr. Wheat. (*Id.* at Page ID # 2318.)

Officer Lajack opinioned that drug samples are only provided whenever the giver "has access or can get access to the larger quantities of drugs" and for "[n]o other reason, period." (*Id.* at Page ID # 2324.)

### ii. Sergeant Dennis Lally identified Mr. Wheat by executing a traffic stop after he left the Circle K.

Sergeant Lally testified that he was on patrol in Cleveland on February 28th when Detective Cuadra advised him to pull over a Honda CR-V. (Lally Test., Trial Tr., R. 226, Page ID # 2331 – 2332.) Mr. Lally pulled the car over under the pretense

of driving without headlights and sent a picture of the driver's license to Detective Cuadra. (*Id.* at Page ID ## 2332 – 2335.) Sergeant Lally gave the driver, Mr. Wheat, a warning. (*Id.* at Page ID # 2334; Ex. List, R. 125, Page ID # 770, Ex. 103.)

### iii. Aaron Reels testified about his drug distribution scheme.

Mr. Reels testified for the government as part of his plea deal. (Reels Test., Trial Tr, R. 226, Page ID # 2346; Ex. List, R. 125, Page ID # 770, Doc. 300.) Mr. Reels testified that he sold heroin, sometimes cut with fentanyl, and cocaine. (*Id.* at Page ID ## 2338 – 2339.) He would ask a drug user to test samples before making a big purchase to check its potency. (*Id.* at Page ID ## 2340 – 2341.)

### 1. Mr. Reels barely knew Mr. Wheat, and there was no preexisting business relationship between them.

Mr. Wheat "inboxed" his phone number to Mr. Reels on social media. (*Id.* at Page ID # 2348.) Mr. Reels called, and Mr. Wheat told him that he found something in Mr. Reels's "field." (*Id.* at Page ID # 2349; Ex. List, R. 125, Page ID # 169, Ex. 14.) They later met at a Circle K gas station, and according to Mr. Reels, Mr. Wheat stood outside the car and handed Mr. Reels drugs through the window. (Reels Test., Trial Tr., R. 226, Page ID # 2351.) Mr. Reels "could tell just by looking at it" that it was "three-tenths of a gram" of heroin. (*Id.* at Page ID ## 2351 – 2352.) Mr. Reels did not pay for the drugs. (*Id.* at Page ID # 2352.) When asked whether this was "a sample of something that" Mr. Reels might buy for his drug dealing, Mr. Reels equivocated: "Maybe." (*Id.* at Page ID # 2352.) Mr. Reels gave the drugs to Mr.

12

Mileca to test. (*Id.* at Page ID # 2353.) Mr. Mileca said that "customers would buy" the drugs. (*Id.* at Page ID ## 2358 – 2359.) Mr. Reels did not buy any drugs from Mr. Wheat and did not contact him again about the sample. (*Id.* at Page ID # 2359.) Mr. Reels testified that he was not in the market for a new drug supplier. (*Id.* at Page ID # 2364.)

Mr. Reels and Mr. Wheat knew very little about each other and only saw each other about once a year. (*Id.* at Page ID # 2364.) When they did see each other, it was social, and business was never discussed. (*Id.* at Page ID # 2381.)

iv. **DEA Agent Heather Grimes testified about the Reels investigation and Mr. Wheat's limited involvement.**

Agent Heather Grimes joined the Cleveland DEA as a special agent in January 2018. (Grimes Test., Trial Tr., R. 227, Page ID ## 2383, 2386.) She testified that she has special drug training including drug identification, methods of distribution and packaging, and drug trafficker evasion. (*Id.* at Page ID # 2383.) Before joining the DEA, she was a police officer in Atlanta who sought out "street-level narcotic dealers." (*Id.* at Page ID # 2384.)

Agent Grimes was one of several agents on surveillance at the Circle K in Cleveland when Mr. Reels and Mr. Wheat met. (*Id.* at Page ID # 2388.) Agent Grimes was parked in a van by the building. (*Id.* at Page ID # 2390.) She saw Mr. Wheat lean in and out of Mr. Reels's window, talking with his hands hidden inside the car. (*Id.* at Page ID # 2390.) Mr. Reels left about three minutes afterwards, but

13

Mr. Wheat stayed for about twenty minutes. (*Id.* at Page ID # 2396.) Agent Grimes's view was obstructed by gas pumps and rain as she watched the interaction through mirrors and her back window. (*Id.* at Page ID ## 2395 – 2396, 2399.) Mr. Wheat was never independently investigated. (*Id.* at Page ID # 2401.)

> **v.      Law enforcement executed search warrants and seized large quantities of heroin, cocaine, and fentanyl from Mr. Reels's "stash" apartment, but Mr. Wheat did not know about or provide any of the seized drugs to Mr. Reels.**

DEA Agent Andrew Nowling testified that he is a special agent with the Cleveland DEA working to "disrupt and dismantle drug organizations throughout the country smuggling" and bring federal criminal charges. (Nowling Test., Trial Tr., R. 227, Page ID # 2405.) As part of the Reels investigation, he conducted surveillance, wrote reports, inventoried drugs, spoke with informants, and executed search warrants. (*Id.* at Page ID # 2407.) When the search warrant was executed for Mr. Reels's stash apartment, there were zero ties to Mr. Wheat found in the residence. (*Id.* at Page ID # 2420.)

Agent Nowling described several photographs depicting drugs and paraphernalia belonging to Mr. Reels, to include large quantities of heroin, cocaine, and fentanyl. (Nowling Test., Trial Tr., R. 227, Page ID # 2410 – 2415; Ex. List, R. 125, Page ID # 770, Ex. 104-114.) Agent Nowling also explained the drugs that were entered as physical exhibits at trial that were seized during the execution of the search warrants. (Nowling Test., Trial Tr., R. 227, Page ID # 2415 – 2416; Ex. List,

R. 125, Page ID # 770, Ex. 202-204.) Mr. Wheat did not know about or provide any of these drugs to Mr. Reels. (Parties Stipulations of Fact, R. 129, Page ID # 780.)

**C.    At the close of evidence at trial, the quantity of drugs element was removed from the Superseding Indictment before being submitted to the jury.**

The government conceded "the weight portion" of the charges against Mr. Wheat and declined to submit "any allegations regarding weight" to the jury "so as not to constrain" the judge's sentencing discretion. (Trial Tr., R. 227, Page ID # 2424.) The government acknowledged that while this move was "an unorthodox step," it did not believe that it "put on the evidence to show specifically that he [Mr. Wheat] did foresee particular weights" and the government did not seek "to prove that (b)(1)(B) weight." (*Id.* at Page ID ## 2424 – 2425.) Defense counsel did not object. (*Id.* at Page ID ## 2424 – 2425.) The Court modified Count 1 "so that it no longer include[d] an allegation regarding quantity." (*Id.* at Page ID # 2431.)

The parties stipulated to eight drug sales from Mr. Reels to various buyers. (Trial Tr., R. 227, Page ID # 2425; Parties Stipulation of Fact, R. 129, Page ID ## 778 – 779.) Each of these stipulations was cabined by a stipulation that "Defendant William Wheat, Jr. did not know about this transaction." (*Id.*) The parties further stipulated to the quantity of drugs found in Mr. Reels's property during the execution of the search warrants. (*Id.* at Page ID # 780.) The stipulation notes that Mr. Wheat "did not specifically know about these drugs." (*Id.*) The parties stipulated that Mr.

15

Wheat and Mr. Reels were the two speakers in the three recorded phone calls that the government introduced as their conversations. (*Id.* at Page ID # 780 – 781.)

**D.    At sentencing, the district court further amended the Superseding Indictment to alter the charged drug offense from a "purchase" by Reels from Wheat to a "receipt" by Reels – an after the fact impermissible conformance of the charges to fit the government's theory that allowed the government to focus its sentencing evidence on Mr. Wheat's potential culpability.**

At the beginning of the sentencing hearing, the judge amended the Superseding Indictment. (Sentencing Tr., R. 228, Page ID ## 2573 – 2576.) First, the government conceded that the indictment misstated Mr. Wheat's involvement because Mr. Reels did not purchase drugs from Mr. Wheat; rather, "it was a free sample" and "there's no evidence that [Mr. Wheat] was paid for that sample." (*Id.* at Page ID # 2573 – 2574.) The court "chang[ed] the verb from 'purchased to 'received' [to] satisfy and accurately reflect the facts." (*Id.* at Page ID # 2576.)

**i.    DEA Agent Rande Reinhard testified that Mr. Wheat was highly culpable because he could have supplied a large quantity of drugs.**

At sentencing, DEA Agent Reinhard testified that he has a background in investigating large-scale heroin and fentanyl trafficking. (*Id.* at Page ID # 2579.) He described the pattern of transactions common to Mr. Reels's drug distribution. Often, "free samples of heroin or heroin product" were given to Mr. Reels "to see if [he] liked it[.]" (*Id.* at Page ID # 2581.) If the heroin got "a good report," Mr. Reels "would then go purchase much larger quantities for the person who supplied it." (*Id.*

16

at Page ID # 2581.) Mr. Reels "would typically purchase several ounce quantities, upwards of half a kilo." (*Id.* at Page ID # 2582.) Agent Reinhard testified that the "interaction between Mr. Wheat and Mr. Reels" was consistent with this pattern. (*Id.* at Page ID # 2581.) He speculated that Mr. Wheat was capable "of supplying ounce quantities up towards at least a half of kilo of heroin" which is "consistent with what Mr. Reels was frequently purchasing from other suppliers." (*Id.* at Page ID # 2582.) Agent Reinhard based this finding on Mr. Reels's known heroin suppliers and his experience investigating "[l]arge-scale drug traffickers in northeast Ohio." (*Id.* at Page ID # 2579, 2582.) He assumed that the "[l]owest amount" of heroin that Mr. Wheat could have provided "is at least 2 ounces." (*Id.* at Page ID # 2586.) Agent Reinhard stated that Mr. Wheat "had the capabilities of being a significant player" in the heroin/fentanyl trade. (*Id.* at Page ID # 2590.) Agent Reinhard further alleged that Mr. Wheat was more likely than not attempting to sell heroin cut with fentanyl, which makes it more potent, despite that "there were never any drugs seized from Mr. Wheat." (*Id.* at Page ID # 2583 – 2584.)

On cross-examination, Agent Reinhard conceded that Mr. Wheat did not fit the typical major drug dealer because he worked a full-time construction job and was attending construction classes (*Id.* at Page ID ## 2593 – 2594). The government argued that Mr. Wheat was likely a middleman for the drug deal. (*Id.* at Page ID # 2605 – 2606.)

### ii. The court assumed the quantity of heroin that Mr. Wheat would have sold to Mr. Reels.

The government argued that Agent Reinhard's testimony showed by a preponderance of evidence that Mr. Wheat was capable of selling "4 ounces or more." (Sentencing Tr., R. 228, Page ID # 2608.) Its certainty was based on Agent Reinhard's experience, not "in terms of what Mr. Wheat had or had access to." (*Id.* at Page ID # 2608.) It assured the judge that Agent Reinhard's determination should be relied upon because "an estimate is appropriate" under Sixth Circuit precedent so long as it does not involve a "sort of willy-nilly guessing at the amounts in a way that could unduly punish a defendant." (*Id.* at Page ID ## 2617 – 2618.) Its estimate was based wholly on "the fact that [Mr. Wheat] provided a free sample in the first place" and what Agent Reinhard had encountered in the field. (*Id.* at Page ID # 2618 – 2620.)

The Court asserted that it was "pretty clear" that Mr. Wheat "didn't turn" drugs "over as a gift. He wanted feedback. [...] And no one [...] gives away something for free." (*Id.* at Page ID # 2635.) The court found "by a preponderance of the evidence that Mr. Wheat did provide at least the .3 grams" and "based on the detective's experience, would have provided as much as 1 ounce of" heroin. (*Id.* at Page ID # 2636.) This amount of heroin "would require at least an offense level of 16." (*Id.* at Page ID # 2636.)

### iii. The parties argued about the appropriate criminal offense level under the sentencing guidelines.

Mr. Wheat had a criminal history score of one because he only had one scored offense, a marijuana violation that resulted in probation. (*Id.* at Page ID # 2638.) The PSR also listed three juvenile offenses and a robbery charge from when he was 18 years old. (*Id.* at Page ID # 2637 – 3638.)

The Court determined Mr. Wheat to be a level 14 under the guidelines because he was a minor participant. (*Id.* at Page ID # 2653.) However, the court stated that Mr. Wheat's "criminal history is understated" because he is "likely to be a recidivist." (*Id.* at Page ID # 2663.) It considered unscored offenses, including Mr. Wheat's juvenile record: "There's a second, there's a third juvenile adjudication." (*Id.* at Page ID # 2637 – 2638.) The court concluded that this "shows a persistence of lawbreaking" and that it was the court's job "to separate lawbreakers from the rest of society." (*Id.* at Page ID # 2665.) The defense pushed back because a significant amount of time had passed since those youth offenses. (*Id.* at Page ID ## 2659 – 2660.) The court noted that "the minor role adjustment was appropriate" but "it led to a range that was insufficient[.]" (*Id.* at Page ID # 2674.) The court varied upwards to an offense level 17 "to avoid sentencing disparity" with similarly situated co-defendants, with an advisory sentencing guidelines range of 24 to 30 months. (*Id.* at Page ID # 2664.) Mr. Wheat was sentenced to 27 months in prison and three years of supervised release. (*Id.* at Page ID ## 2665 – 2666.) Defense counsel objected to

19

the upward variance from the sentencing guidelines and the upward adjustment to

the quantity of drugs. (*Id.* at 2678.)

# SUMMARY OF THE ARGUMENT

Mr. Wheat's convictions and sentence should be reversed.

First, the Superseding Indictment is insufficient as a matter of law in that it does not state all the essential elements of the charged conspiracy. The failure of the Superseding Indictment to sufficiently allege all the elements of conspiracy is error that violated Mr. Wheat's right to know the charges against him in violation of the Fifth and Sixth Amendments to the United States Constitution.

Second, the allegations in the Superseding Indictment were unlawfully amended during trial and at sentencing in a way that benefited the government to the prejudice of Mr. Wheat. The allegations in the Superseding Indictment were amended at the close of proof at trial and were again amended during sentencing. At the close of proof, the court removed the drug quantity element from the charges to comply with the government's insufficient proof and materially changed the charges against Mr. Wheat. At sentencing, the allegations were again amended to conform to the government's evidence that Mr. Reels did not purchase drugs from Mr. Wheat but instead received drugs, the only proof of which came from Mr. Reels's trial testimony. There is also a fatal variance between the number of conspiracies alleged in the Superseding Indictment and that shown at trial.

Third, the government presented insufficient evidence to support the charged offenses at trial. At trial, there was insufficient evidence showing that a conspiracy

21

existed. At most, the government's proof established a potential buyer-seller relationship between Mr. Wheat and Mr. Reels, which is insufficient to prove the criminal conspiracy as charged. Even if there was a single conspiracy, there is insufficient evidence that Mr. Wheat knowingly and voluntarily joined that conspiracy. Additionally, there is insufficient evidence that Mr. Wheat possessed heroin with intent to distribute, and Mr. Wheat's conviction for use of a communication facility in furtherance of a drug trafficking crime is not supported by sufficient evidence.

Finally, Mr. Wheat's sentence is procedurally and substantively unreasonable and is constitutionally and statutorily inadequate. Mr. Wheat's sentence is procedurally unreasonable because the court's guidelines determination was erroneously rooted in a quantity of drugs that was not supported by a preponderance of the evidence, and the sentencing court misconstrued the § 3553(a) factors when applying the upward variance. The sentencing court misused Mr. Wheat's juvenile record to support its finding that his criminal history was understated. In addition, the court's concern for sentencing disparity is unwarranted and lead to an erroneous result.

## ARGUMENT

**III. THE SUPERSEDING INDICTMENT WAS INSUFFICIENT BECAUSE IT FAILED TO STATE THE ELEMENTS OF THE OFFENSE AND WAS UNLAWFULLY AMENDED.**

### A. The Superseding Indictment does not state all the elements.

An indictment must be "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). The indictment must contain all the elements of the charged offense and enable the accused "to plead an acquittal or conviction in bar of future prosecutions for the same offense" to preserve the defendant's constitutional rights to a grand jury indictment and to be free from double jeopardy. U.S. Const. amend. V, VI; *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see United States v. Hart*, 640 F.2d 856, 857 (6th Cir. 1981).

The sufficiency of the indictment is reviewed de novo if it was properly preserved. *See United States v. Lawrence*, 557 F. App'x 520, 523 (6th Cir. 2014) (citing *United States v. DeZard*, 157 F.3d 1042, 1046 (6th Cir. 1998) and Fed. R. Crim. P. 12(b)(3)(B)). The overall sufficiency of the Superseding Indictment as to Mr. Wheat was fairly raised below by the arguments raised concerning the sufficiency of the conspiracy allegations. (Trial Tr., R. 227, Page ID ## 2432 – 2435; Sealed Mot. for a J. of Acquittal, R. 138, Page ID ## 809 – 811; Sealed Gov. Opp'n to Def. Mot. for J. of Acquittal, R. 162, Page ID # 1072; Sealed Def. Reply to Gov.

Opp'n to Def. Mot. for J. of Acquittal, R. 176, Page ID ## 1205 – 1206; Sealed Mem. & Order, R. 200, Page ID ## 1453 – 1459.)

Even if waiver can be construed, plain error review applies. *See United States v. Cotton*, 535 U.S. 625, 631 (2002). "[T]here must be (1) error, (2) that is plain, and (3) that affects substantial rights," *Cotton*, 535 U.S. at 631 (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1979)). An error affects substantial rights when there is a "'reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (citing *Olano*, 507 U.S. at 734). Next, the court considers whether the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *Johnson*, 520 U.S. at 467). The indictment "will be construed liberally in favor of its sufficiency." *United States v. Gibson*, 513 F.2d 978, 979 (6th Cir. 1975) (citing *United States v. Norman*, 391 F.2d 212 (6th Cir. 1968)). The defendant must show prejudice or that "the indictment cannot within reason be construed to charge a crime." *Hart*, 640 F.2d at 857-58.

### i. The superseding indictment does not allege all the elements of a conspiracy.

Conspiracy requires three distinct elements. First, a shared objective to be accomplished; second, "[a] plan or scheme embodying the means to accomplish that object[;]" and third, "[a]n agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the

accomplishment of the object by means embodied in the agreement, or by any effectual means." *United States v. Carver*, 470 F.3d 220, 232-33 (6th Cir. 2006) (quoting *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999)).

The superseding indictment alleges that Mr. Wheat "sold drugs to" Mr. Reels and "used telephones [...] to communicate with narcotics customers" and to "make and receive telephone calls, and to send and receive text or other electronic messages, to conduct their drug trafficking activity." (Superseding Indictment, R. 21, Page ID ## 79 – 80.) Mr. Wheat's supposed actions in furtherance of the conspiracy are three telephone conversations and a meeting at the Circle K, where Mr. Reels "purchased a quantity of drugs." (*Id.* at 89.)

> **ii.** **The failure of the Superseding Indictment to sufficiently allege all the elements of conspiracy is a error that violated Mr. Wheat's right to know the charges against him.**

The Superseding Indictment fails to state all the essential elements of the conspiracy charge against Mr. Wheat. First, there is no allegation of a shared objective between Mr. Wheat and the other defendants. *See Carver*, 470 F.3d at 232. At most, the facts asserted in the indictment state that Mr. Wheat intended to sell an undefined quantity of drugs to Mr. Reels, not to join a massive distributorship in the area. Second, while the indictment blindly alleges that Mr. Wheat was in a conspiratorial relationship with Mr. Reels, Mr. Williams, and Mr. Mileca, it does not assert a common plan or scheme – rather, it identifies various interwoven interests

that intersect with Mr. Reels. *See id.* Third, the indictment does not assert any definite commitment to cooperate in furtherance of a common plan. *See id.*

The indictment does not adequately set out the basis for Mr. Wheat's involvement in the conspiracy, depriving him of his right to know the charges against him. U.S. Const. amend. VI. This is a substantial impediment to Mr. Wheat's constitutional rights to due process, a fair trial, and to be informed of the charges against him. U.S. Const. amend. V & VI.

**B.      The Superseding Indictment was unlawfully amended at trial and at again sentencing.**

Modifications to an indictment manifest as actual amendments, variances, or constructive amendments. *See United States v. Hynes*, 467 F.3d 951, 961 (6th Cir. 2006). Actual and constructive amendments are "*per se* prejudicial and are reversible error" because they directly infringe on the defendant's grand jury guarantee and his right to know the charges against him. *United States v. Budd*, 497 F.3d 517, 521 (6th Cir. 1986) (citing *United States v. Prince*, 214 F.3d 740, 757 (6th Cir. 2000)); *see* U.S. Const. amend. V; *Martin v. Kassulke*, 970 F.2d 1539, 1542 (6th Cir. 1992); *United States v. Chillingirian*, 280 F.3d 704, 711 (6th Cir. 2002).

"A variance 'occur[s] when the charging terms of an indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.'" *Hynes*, 467 F.3d at 961 (quoting *United States v. Combs*, 369 F.3d 925, 935-36 (6th Cir. 2004)). A constructive amendment is a severe

form of a variance that effectively changes the terms of the indictment. *See id.* at 961-62 (quoting *Combs*, 369 F.3d at 936).

The superseding indictment was twice amended. First, it was amended at trial when the court removed the quantity of drugs as a charged element of the crime. Second, it was amended at sentencing when Mr. Wheat's action in furtherance of the conspiracy was changed from selling drugs to giving drugs to Mr. Reels.

### i. The allegations in the Superseding Indictment were amended at the close of proof at trial and again during sentencing.

"An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them." *Martin*, 970 F.2d at 1542.

### 1. The court removed the drug quantity element from the charges to comply with the government's proof and materially changed the charges against him.

The Superseding Indictment alleges that Mr. Wheat's actions in furtherance of the conspiracy were limited to selling "a quantity of drugs" to Mr. Reels. (Superseding Indictment, R. 21, Page ID # 89.) At trial, it became clear that no money exchanged hands and any drugs given to Mr. Reels by Mr. Wheat – the only evidence of which was Mr. Reels's testimony - were free of charge. (Reels Test., Trial Tr., R. 226, Page ID ## 2351 – 2352.) The court changed the operative language of the indictment. (Sentencing Tr., R. 228, Page ID # 2576.) The

government framed the changes as correcting a "misstatement in the superseding indictment." (*Id.* at Page ID # 2574.)

The government conceded the weight portion because it could not "put on the evidence to show specifically that he did foresee particular weights" and took this element out of the jury's determination and placed it within the judge's sentencing discretion. (Trial Tr., R. 227, Page ID # 2424.) The charges were modified and submitted to the jury as amended to better fit the government's proof and theory of the case once its proof fell short at trial. (Trial Tr., R. 227, Page ID ## 2431 – 2432 ("[T]he court grants the motion to the extent it's one *allowing the government to modify the charge* as to Mr. Wheat, so that it no longer includes an allegation regarding quantity.") (emphasis added.) This violated Mr. Wheat's rights for the trial jury to determine the allegations against him found by the grand jury. U.S. Const. amend. V& VI.

> **2. At sentencing, the allegations were amended to indicate that Mr. Reels did not purchase drugs from Mr. Wheat.**

At sentencing, the defense objected to the PSR on the basis that the facts at trial did not show that "Mr. Wheat was paid for the quantity of drugs he gave Mr. Reels." (Sentencing Tr., R. 228, Page ID # 2576.) The objection to this portion of the PSR, which just repeated the facts of the Superseding Indictment, was "well taken" by the lower court, but in response the court changed the words in the PSR

from "purchased" to "received" to "satisfy and accurately reflect the facts" shown by the record. (*Id.*) This was, in effect, an amendment to the allegations in the Superseding Indictment in an attempt to cure the insufficient evidence the government presented at trial on the charges as alleged in the Superseding Indictment. Because actual amendments are *per se* prejudicial, Mr. Wheat's conviction should be vacated. U.S. Const. amend. V.

### ii. There is a fatal variance between the number of conspiracies alleged in the Superseding Indictment and that shown at trial.

A variance will violate the defendant's constitutional rights when the charges in the indictment significantly diverge from the actual evidence introduced by the government at trial. U.S. Const. amend. V & VI. The defendant must show that his substantial rights have been affected because his ability to defend himself at trial has been prejudiced, the trial is generally unfair, or the indictment unable to protect against double jeopardy. *See Hynes*, 467 F.3d at 962 (quoting *United States v. Barrow*, 118 F.3d 482, 488-89 (6th Cir. 1997)). A variance is substantially prejudicial whenever it effects the defendant's "ability to defend himself or the overall fairness of his trial." *Id.* (citing *United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998).) This includes surprises at trial, spillover from "a large number of improperly joined defendants[,]" or "where the defendant is convicted for

substantive offenses committed by another[.]" *Id.* (quoting *United States v. Swafford*, 512 F.3d 833, 842-43 (6th Cir. 2008)).

> A defendant's substantial rights are affected if the defendant is convicted on evidence "unrelated to his own alleged activity." Accordingly, the inquiry into whether a variance constitutes reversible error focuses on whether a danger exists that the defendant was convicted based on evidence of a conspiracy in which the defendant did not participate ("guilt transference"). Typically, the danger of guilt transference "can be cured with a cautionary instruction to the jury that if it finds multiple conspiracies, evidence relating to one conspiracy cannot be considered in examining another conspiracy." *However, the more evidence presented at trial that is unrelated to the defendant's conduct, or a conspiracy in which the defendant took part, the less likely instructions are to cure the danger of guilt transference.*

*United States v. Blackwell*, 459 F.3d 739, 762 (6th Cir. 2006) (internal citations omitted) (emphasis added). A variance can be proven by only examining the evidence at trial. *See Hynes*, 467 F.3d at 962.

To establish a fatal variance, the defense must satisfy a two-prong test: (1) there is a variance between the indictment and the proof; and (2) "the variance affected some substantial right of the defendant." *Wilson*, 168 F.3d at 923-24. Prejudice does not exist whenever sub-conspiracies committed "acts in furtherance of one overall plan" of the overarching conspiracy. *Id.* at 924.

A conspiracy is a distinct legal concept and must not be confused with "the common purpose of a single enterprise with the several, though similar, purposes of

numerous separate adventures of like character." *See Kotteakos v. United States*, 328

U.S. 750, 769 (1946). When a single conspiracy is charged but the proof shows

multiple conspiracies, the government must show "that the judgment was not

substantially swayed by the error," otherwise, "it is impossible to conclude that

substantial rights were not affected." *Kotteakos*, 328 U.S. at 764-65. "To determine

whether a variance has occurred," the court must "look to whether the evidence can

'reasonably be construed only as supporting a finding of multiple conspiracies'

rather than the single conspiracy alleged in the indictment." *United States v. Mize*,

814 F.3d 401, 410 (6th Cir. 2016) (quoting *Warner*, 690 F.2d at 548). *Mize* provides

a familiar example of such a variance:

> The evidence in this case undoubtedly established two conspiracies, not just the one charged in the indictment. The government presented an extraordinary volume of evidence about the Bussell conspiracy. Even in its opening statement, the government began by giving the jury extensive information about the Bussell conspiracy. It then introduced testimony about the volume of drug transactions effected by the Bussell conspiracy. The government also presented a history of the investigation of the Bussell conspiracy which included wiretaps, surveillance, controlled buys, drug deals, and even surveillance photographs of members of the Bussell conspiracy. Even Bussell himself—along with several of his convicted collaborators—testified about the operation of his conspiracy. [...]

> The government then argued to the jury that the Mize conspiracy operated in the same manner to commit the same crimes. By the close of its case-in-chief, the government had presented eleven witnesses—eight of

whom discussed the Bussell conspiracy at some length. Indeed, during its direct examination of Drug Enforcement Administration ("DEA") Agent Bethel Poston, the government even acknowledged that the majority of Poston's testimony was about Bussell:

> Q [government]: That's the Trent Bussell you have been talking about since you hit the witness stand practically?
>
> A [Poston]: It is.
>
> We think that if the testimony introduced by the government established anything, it was that Kevin Bussell operated a large scale drug trafficking organization responsible for the importation and distribution of hundreds of thousands of dollars' worth of pills from Florida to Tennessee. It is clear from our reading of the record that the government introduced significantly more evidence than it should have about the separate Bussell conspiracy. We therefore find that the government's evidence rises to the level of a variance.

*Id.* at 410-11.

At trial, the defense repeatedly contested the absence of a conspiratorial agreement between Mr. Wheat and Mr. Reels. (Trial Tr., R. 227, Page ID ## 2432 – 2435; Sealed Mot. for a J. of Acquittal, R. 138, Page ID ## 809 – 811; Sealed Gov. Opp'n to Def. Mot. for J. of Acquittal, R. 162, Page ID # 1072; Sealed Def. Reply to Gov. Opp'n to Def. Mot. for J. of Acquittal, R. 176, Page ID ## 1205 – 1206; Sealed Mem. & Order, R. 200, Page ID ## 1453 – 1459.) The government's proof at trial at best showed several related but distinct conspiracies, not the single conspiracy charged in the indictment. *See Kotteakos*, 328 U.S. at 755. This, without

more, creates a pattern of "several spokes meeting in a common center," Mr. Reels, "without the rim of the wheel to enclose the spokes." *Id.* at 755. Moreover, the jury instructions did not address the possibility of multiple conspiracies, and there is a significant risk that Mr. Wheat was convicted for "guilt transference" from Mr. Reels's dealings. As in *Mize*, "[t]he evidence from a different scheme" of Mr. Reels's operations "was used to portray" Mr. Wheat "in a grossly prejudicial light before the jury. This error enabled the government to bombard the jury with evidence" of the Reels conspiracy "and its cast of characters and recorded conversations and photographs, when, in fairness, those things had little to do with" the alleged conspiracy between Mr. Reels and Mr. Wheat. *Mize*, 814 F.3d at 412.

The bulk of the trial was devoted to establishing Mr. Reels's large drug conspiracy. At its best for the government, Mr. Wheat's tie to that conspiracy was no more than a single drug exchange – not even a purchase or sale. The parties stipulated that Mr. Wheat did not know about the other conspirators or the drugs in possession of other parties, including Mr. Reels. (Parties Stipulations of Fact, R. 129, Page ID ## 778 – 781.) Most of the evidence was "unrelated to the defendant's conduct" and created a substantial risk of guilt transference that was not addressed in the jury instructions. *See Blackwell*, 459 F.3d at 762. This variance in the number of conspiracies prejudiced Mr. Wheat by effectively holding him accountable for the

33

crimes of Mr. Reels and a conspiracy that he did not join, and his convictions should be vacated.

## IV.     MR. WHEAT'S CONVICTIONS SHOULD BE VACATED BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

A challenge to the sufficiency of evidence to support a criminal conviction is reviewed de novo. *See United States v. Pritchett*, 749 F.3d 417, 430 (6th Cir. 2014) (quoting *United States v. Carson*, 560 F.3d 566, 579 (6th Cir. 2009)). The court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Pritchett*, 749 F.3d at 430-31 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This issue was preserved in the lower court through the defendant's motions for acquittal. (Sealed Mot. for a J. of Acquittal, R. 138, Page ID ## 809 – 811; Trial Tr., R. 227, Page ID # 2432 – 2435.)

The defense asserted that the "uncontroverted testimony that" Mr. Wheat and Mr. Reels "never discussed business" indicates that "the crucial element of an agreement to support a criminal conspiracy conviction was lacking" and Mr. Wheat should have been acquitted of Count 1. (*Id.* at Page ID # 810.) The government responded that the evidence supports an inference that Mr. Wheat and Mr. Reels "had a 'tacit understanding' to distribute both the heroin provided as a tester and to act as a source of supply in the future." (Sealed Gov. Opp'n to Def. Mot. for J. of Acquittal, R. 162, Page ID # 1072.) The defense further argued that the lack of

involvement after the Circle K meeting is a "factual consideration supporting the absence of a criminal agreement." (Sealed Def. Reply to Gov. Opp'n to Def. Mot. for J. of Acquittal, R. 176, Page ID ## 1205 – 1206.) Moreover, the weight of the evidence was against Mr. Reels and that "[t]he actual narcotics alleged here were never recovered." (Trial Tr., R. 227, Page ID # 2433.) The court denied the motion because there was "sufficient evidence for any rational trier of fact to find [Mr. Wheat] guilty of Count 1 as modified by the government, and also of Count 18." (*Id.* at Page ID ## 2436 – 2437.)

**A.    There was insufficient evidence showing that a conspiracy existed.**

**i.    At most, the government's proof established a potential buyer-seller relationship between Mr. Wheat and Mr. Reels, which is insufficient to prove a criminal conspiracy.**

A buyer-seller relationship alone cannot prove a conspiracy. *See United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009) (quoting *United States v. Cole*, 59 F. App'x 696, 699 (6th Cir. 2003)). A mere purchase or sale of drugs does not prove a conspiracy "any more than a purchase of 100 tons of steel to build a skyscraper shows that the buyer has 'joined' the corporate enterprise of the manufacturer." *Baker*, 905 F.2d at 1106 (citing *United States v. Koenig*, 856 F.2d 843, 854 (7th Cir. 1988) and *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir. 1978)). Whether a drug sale is part of a larger conspiracy rests on four factors: "(1) the length of the relationship; (2) the established method of payment; (3) the extent to which

transactions are standardized; and (4) the level of mutual trust between the buyer and the seller." *Deitz*, 577 F.3d at 680-81 (citing *Cole*, 59 F. App'x at 700). None of these factors are dispositive standing alone. *See Cole*, 59 F. App'x at 700. The government must present "additional evidence, *beyond the mere purchase or sale*, from which knowledge of the conspiracy could be inferred." *Id.* at 699-700 (emphasis added)

An "inference of a conspiracy" might be raised by "a large quantity of drugs, [...] repeat purchases, purchase of a large volume, [] some other enduring arrangement," or a history of fronting drugs before payment. *Id.* at 700 (citing *United States v. Anderson*, 89 F.3d 1306, 1311 (6th Cir. 1996) and *United States v. Boujaily*, 781 F.2d 539, 544 (6th Cir. 1986)). "[E]vidence of repeat purchases from a single source and large volumes of narcotics creates an inference of conspiracy." *United States v. Castro*, 2020 U.S. App. LEXIS 17533, at *15 (6th Cir. June 3, 2020) (quoting *Pritchett*, 749 F.3d at 431).

The government must show that the "defendant knew the existence and scope of the conspiracy and sought to promote its success." *United States v. Baker*, 905 F.2d 1100, 1106 (7th Cir. 1990) (citing *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir. 1985)). The government's theory hangs on the thread of Mr. Wheat giving a small, unconfirmed quantity of drugs to Mr. Reels at a gas station. From this, the government argued that Mr. Wheat was prepared to sell a large quantity of heroin to

Mr. Reels. A mere purchase of drugs, standing alone, does not prove a conspiracy, and a small delivery of drugs given *without an exchange of payment* is even less persuasive.

First, while Mr. Wheat and Mr. Reels shared a loose acquaintanceship for several years, they had *no* standing business relationship. (Reels Test., Trial Tr., R. 226, Page ID ## 2364, 2381); *see Deitz*, 577 F.3d at 680-81. Second, there was no established method of payment because money never exchanged hands and the government did not show any evidence indicating a potential payment plan, should a business relationship have arisen. *See Deitz*, 577 F.3d at 680-81. Third, to the extent that the transaction between Mr. Reels and Mr. Wheat was "standardized," the government relied on the standard drug deals among drug dealers generally. *Id.* This is too broad to meet the *Deitz* factors as a single transaction cannot be used to show standardization amongst the parties because an individualized comparison is impossible. Finally, there is no showing of "mutual trust" between Mr. Reels and Mr. Wheat. *Id.* If anything, the lack of communication between them after the sample indicates that Mr. Reels did not trust Mr. Wheat to carry out any further dealings and barred him from the conspiracy.

**ii.     Even if there was a single conspiracy, there is insufficient evidence that Mr. Wheat knowingly and voluntarily joined that conspiracy.**

There is insufficient evidence connecting Mr. Wheat to Mr. Reels's drug conspiracy. Even if Mr. Wheat, who barely knew Mr. Reels, knew about Mr. Reels's drug dealings, there is no evidence that Mr. Wheat "purposefully joined the conspiracy" or "consciously committed himself to the furtherance" of the conspiracy. *Carver*, 470 F.3d at 233. At most, the proof shows that Mr. Wheat may have given a small amount of drugs to Mr. Reels. There was no subsequent contact. (Sentencing Tr., R. 228, Page ID # 2643.) There can be no "agreement to violate the drug laws" when there is no agreement at all. *Carver*, 470 F.3d at 232.

The government alleges that Mr. Wheat's objective was to set up a large drug sale. However, this has not been proven beyond the "willy-nilly guessing" that Mr. Wheat could sell a large quantity of drugs. (Sentencing Tr., R. 228, Page ID # 2608.) The government relied on the actions and drug deals of other, sophisticated drug dealers to argue that Mr. Wheat surely acted in conformity, while acknowledging that Mr. Wheat did not fit the standard picture of a sophisticated drug dealer in that area. (*Id.* at Page ID # 2593 – 2594.) The government did not present any evidence that Mr. Wheat actually joined Mr. Reels's conspiracy. It is wholly irrational to find a conspiracy existed without supporting evidence for an essential element of the

crime. Therefore, there was insufficient evidence to convict Mr. Wheat of a conspiracy and his conviction must be vacated.

**B.     There is insufficient evidence that Mr. Wheat possessed heroin with intent to distribute.**

There is insufficient proof that Mr. Wheat gave Mr. Reels heroin. The sole shred of evidence is Mr. Reels's testimony that it looked like three-tenths of a gram of heroin. (Reels Test., Trial Tr., R. 226, Page ID ## 2351 – 2352.) Because of his drug dealing, Mr. Reels could "kind of" recognize heroin. (*Id.* at Page ID # 2339.) When Mr. Wheat offered him "something in the field," Mr. Reels believed that he was talking about "heroin, cocaine or weed or" something else. (*Id.* at Page ID # 2349.) This highly specific weight was eyeballed in his car on a rainy day. (*Id.*) Mr. Reels immediately handed it off to Mr. Mileca. (*Id.*) The DEA did not test the drugs to confirm its substance.

There is insufficient evidence that the substance involved was heroin. Mr. Reels testified that it was heroin based on how it looked, then handed it off to Mr. Mileca. Mr. Mileca did not testify about the drugs he consumed. Instead, the court permitted hearsay testimony from Mr. Reels that Mr. Mileca confirmed it was heroin. Fed. R. Evid. 801. The defense was denied the right to confront Mr. Mileca about the truth of this statement. U.S. Const. amend. VI. Given that Mr. Wheat could have thought Mr. Reels's "field" included cocaine, heroin, weed, or other drugs,

there is a substantial likelihood that the drug at the Circle K was not heroin, but another substance altogether.

### C. Mr. Wheat's conviction for use of a communication facility in furtherance of a drug trafficking crime is not supported by sufficient evidence.

There is insufficient evidence to support Mr. Wheat's conviction for Count 18. (Superseding Indictment, R. 21, Page ID ## 94 – 95.) The elements for this charge are that the defendant: (1) "knowingly or intentionally" (2) used "any communication facility" (3) to commit, cause, or facilitate any act "constituting a felony" under § 843. 21 U.S.C. § 843(b). To facilitate means to aid, abet, or assist. *See United States v. Slayton*, 366 F. App'x 650, 655 (6th Cir. Feb. 25, 2010) (quoting *Abuelhawa v. United States*, 556 U.S. 816, 824 (2009)). The government must prove that the phone conversations actually facilitated the conspiracy. *See Slayton*, 366 F. App'x at 655-56.

The defense objected to this charge because, unlike the other defendants, Mr. Wheat did not change his phone number to further the conspiracy. (Sentencing Tr., R. 228, Page ID ## 2574 – 2576.) The defense preserved this issue in his Rule 29 motion by arguing that this Count was not supported by sufficient evidence. (Trial Tr., R. 227, Page ID # 2435.) Because the underlying offense of conspiracy to distribute controlled substance is unsupported by the record, Mr. Wheat's conviction for use of a communication facility in furtherance thereof is missing its logical link

and is unsupported by the evidence. Thus, Mr. Wheat's conviction for this count is insufficient as a matter of law and must be reversed.

Mr. Wheat did not use his phone to the same extent as his co-defendants. He never changed his phone number and did not use a false name. (Trial Tr., R. 227, Page ID ## 2501 – 2502.) Unlike his co-defendants, Mr. Wheat did not purchase multiple phones under different names to cover his tracks. The allegedly incriminating calls between Mr. Wheat and Mr. Reels were used to arrange a meeting at a gas station for further discussion. Organizing basic logistics should not be equated with "facilitating a drug crime." Moreover, the government did not present any evidence supporting their underlying contention that the phone call in question facilitated the overall conspiracy.

## V. MR. WHEAT'S SENTENCE SHOULD BE VACATED BECAUSE THE SENTENCING PROCEDURES WERE CONSTITUTIONALLY AND STATUTORILY INADEQUATE.

"Criminal sentences are reviewed for procedural and substantive reasonableness." *United States v. Lanning*, 633 F.3d 469, 473 (6th Cir. 2011) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). The sentence is reviewed for abuse of discretion. *See United States v. Baker*, 521 F. App'x 371, 373 (6th Cir. Mar. 29, 2013) (citing *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007)). However, plain error review applies if the sentencing court "conducted a *Bostic* inquiry and the defendant failed to object to the procedural reasonableness of the sentence."

*Baker*, 521 F. App'x at 373 (citing *United States v. Davy*, 433 F. App'x 343, 347 (6th Cir. 2011)). The procedural and substantive reasonableness issues raised on appeal are fairly included within trial counsel's objections to the PSR and arguments and objections made at the sentencing hearing.

The sentencing court first determines the applicable guideline range of the defendant. *See Gall*, 552 U.S. at 49. Then, it considers the factors set out in 18 U.S.C. § 3553(a) "to determine whether they support the sentence requested by the party" through an individualized assessment. *See id.* If the court determines that a sentence outside the guidelines is appropriate, the court must provide adequate justification for the deviation. *See id.* at 50. The court must give "due deference" to the lower court's determination that "§ 3553(a) factors justify a variance." *Lanning*, 633 F.3d at 474 (quoting *Gall*, 552 U.S. at 51).

The PSR measured Mr. Wheat's offense level as a 12 with a Category I criminal history score, resulting in an advisory guidelines sentence of 10 to 16 months. (Sealed Presentence Report Revised, R. 199, Page ID ## 1437, 1440, 1445.) The sentencing court raised the base offense level to 16 based on its finding that the quantity of drugs should be 1 ounce, or 28 grams, for sentencing purposes. (Sentencing Tr., R. 228, Page ID # 2636.) The offense level was then downgraded to level 14 because the court found Mr. Wheat was a minor participant in the conspiracy, which carries a recommended sentencing range of 15 to 21 months. (*Id.*

at Page ID # 2653.) After a discussion of the § 3553(a) factors, the sentencing court varied upward and raised the offense level to 17, which carries a sentencing range of 24 to 30 months, and Mr. Wheat was sentenced to 27 months in prison. (J. Criminal Case, R. 204, Page ID ## 1516 – 1517; Sentencing Tr., R. 228, Page ID ## 2654 – 2665.)

A.  **Mr. Wheat's sentence is procedurally unreasonable because the court's guidelines determination was erroneously rooted in a quantity of drugs that was not supported by a preponderance of the evidence.**

Procedural reasonableness requires that the sentencing court properly calculated the guidelines range, including an explanation for any judicial variances. *See Lanning*, 633 F.3d at 474 (quoting *United States v. Presley*, 547 F.3d 625, 629 (6th Cir. 2008). If the determination is procedurally reasonable, the reviewing court may then consider the substantive reasonableness of the sentence for abuse-of-discretion through a totality-of-the-circumstances analysis. *See id.* (quoting *Gall*, 552 U.S. at 51).

A sentencing judge may find that "a defendant is responsible for a greater quantity of drugs than determined by the jury" and apply the higher quantity to its sentencing determination. *Castro*, 2020 U.S. App. LEXIS 17533, at *21 (citing *United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam)). The quantity of drugs must be found by a preponderance of the evidence and is reviewable for clear error. *See id.* at 21-22 (citing *United States v. Williams*, 29 F. App'x 198, 202 (6th Cir.

43

2001) and *United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998)). "A district court's determination of the quantity of drugs used to compute a defendant's sentence is a finding of fact" that should be rejected if it is clearly erroneous. *Pruitt*, 156 F.3d at 547 (quoting *United States v. Thomas*, 49 F.3d 253, 259 (6th Cir. 1995)); *see also Wilson*, 168 F.3d at 924-25 (citing *United States v. Walton*, 908 F.2d 1289, 1300-01 (6th Cir. 1990)) ("The district court's determination of the amount of drugs for which a defendant is responsible is a factual finding" subject to "clearly erroneous" review.). The quantity must be "supported by 'competent evidence on the record'" to survive clearly erroneous review. *Pruitt*, 156 F.3d at 647 (quoting *Thomas*, 49 F.3d at 259).

The sentencing court found that Mr. Wheat *would have sold* at least 1 ounce, or 28 grams, of heroin. (Sentencing Tr., R. 228, Page ID # 2636.) This was based on the average drug dealer in Agent Reinhard's opinion. The government conceded that Mr. Wheat is not the average drug dealer. (*Id.* at Page ID ## 2593 – 2594.) There was no evidence, other than Agent Reinhard's speculation, about the quantity of drugs Mr. Wheat could have sold to Mr. Reels. Agent Reinhard investigates large-scale drug distribution networks and his average transaction is likely of significantly higher quantities than small-time drug deals. (*Id.* at Page ID # 2579.) Mr. Wheat does not have a history with large distribution networks like Mr. Reels, yet he was held accountable for the average drug deal within a large network of experienced

44

drug dealers. At sentencing, the defense objected to "the upward adjustment on the quantity" of drugs found by the court. (*Id.* at Page ID # 2678.)

Mr. Wheat's sentence was based on generalizations for large-scale drug dealers based only on the common act of providing a small sample of heroin to a known drug dealer. This fact, and Agent Reinhard's generalizations, are clearly insufficient to establish the amount of heroin that Mr. Wheat was allegedly prepared to sell in furtherance of the conspiracy. There is no evidence on the record about Mr. Wheat's capacity to provide drugs and insufficient evidence likening Mr. Wheat to the kind of general, large-scale drug dealers that Agent Reinhard is accustomed to investigating. The preponderance of the evidence standard is a low bar, but the absence of *any* direct or circumstantial evidence about *Mr. Wheat*'s capacity to sell, this finding is clearly erroneous and must be dismissed. *See United States v. Ballard*, 86 F. App'x 886, 888 (6th Cir. Jan. 27, 2004) ("A finding of fact is clearly erroneous when, although there may be some evidence to support the finding, the 'reviewing court is left with the definite and firm conviction that a mistake has been committed.'") (quoting *Kline v. TVA*, 128 F.3d 337, 341 (6th Cir. 1997)).

**B.     Mr. Wheat's sentence is substantively unreasonable because the sentencing court misconstrued the § 3553(a) factors when applying the upward variance.**

Judicial variances must be based on the statutory factors in 18 U.S.C. § 3553(a), including: "(1) the nature of the offense; (2) the need for deterrence and to

protect the public; (3) the desire to provide the defendant with needed training, medical care, or other treatment; (4) any established sentencing range; and (5) the avoidance of unwarranted sentencing disparities." *United States v. Muhammad*, 2019 U.S. App. LEXIS 17425, at *4-5 (6th Cir. June 10, 2019) (citing 18 U.S.C. § 3553(a)).

The sentencing court applied an upward variance to "avoid unwarranted sentencing disparity" and to "promote respect for the law" because the court did not believe that the guideline range of 15 to 21 months would be "sufficient punishment" or "enough to deter" Mr. Wheat. (Sentencing Tr., R. 228, Page ID # 2664.) The court asserted that Mr. Wheat's "history shows a persistence of lawbreaking[.]" (*Id.* at Page ID # 2665.) The court varied upward from an offense level 14 to level 17. (*Id.*) The defense objected to the court's variance. (*Id.* at Page ID ## 2675 – 2676; 2678.)

> **i.** **The sentencing court misused Mr. Wheat's juvenile record to support its finding that his criminal history was understated.**

Juvenile adjudications in Ohio are rehabilitative, not punitive, and intend "to avoid treatment of youngsters as criminals and insulate them from the reputation and answerability of criminals[.]" *State v. Hand*, 149 Ohio St. 3d 94, 98-99 (Ohio 2016) (quoting *In re Agler*, 249 N.E.2d 808, 814 (1969)). Juvenile court rests on the presumption "that children are neither innately prone to criminal behavior nor do they choose to act as criminals. Instead, the belief was that the criminality of children

was determined by extrinsic forces beyond their control, such as poverty and parental neglect, and children therefore should not be held to the same standard of criminal liability as adults." *See* Courtney Fain, *Note: What's in a Name? The Worrisome Interchange of Juvenile "Adjudications" with Criminal "Convictions"*, 49 B.C. L. Rev. 495, 498 (March 2008). Initially, adult sentencing courts were not allowed to consider juvenile adjudications when determining whether a defendant would recidivate. *See* Fain at 509. Today, most jurisdictions allow the court to consider juvenile histories, even though the juvenile court's mission is unchanged, and its adjudications are not subject to the same protections as adult criminal proceedings, including the right to a jury. *See id.* at 518-20.

Mr. Wheat was in foster care between the ages of 5 and 13 because his mother used crack cocaine in the home and his father was absent. (Sealed Presentence Report, R. 199, Page ID # 1442.) His mother used drugs, prostituted herself and suffered domestic abuse at the hand of his father. (*Id.*) In foster care, he was exposed to more drug abuse and violence. (*Id.*) Mr. Wheat predictably ended up in juvenile court when he was 17 years old, where his three adjudications were disposed of in the same instance. (*Id.* at Page ID # 1439.)

The court used Mr. Wheat's juvenile adjudications to paint him as a bad actor bound to recidivate. Mr. Wheat's first juvenile offense is for being "unruly". (*Id.*) Under the Ohio juvenile code at the time of Mr. Wheat's adjudications, an "unruly

child" could be anyone under the age of eighteen who: does not submit to his parents or other adults with authority, is habitually truant, "is found in a disreputable place" or associates with bad persons, works in a prohibited occupation, or violates any law only applicable to a child. Ohio Rev. Code Ann. § 2151.022 (LexisNexis 1999). The unruly child offense could be no more than mere teenage misconduct, which should not be used as the basis for a bad actor label well into the person's adulthood.

Although the sentencing court did not provide criminal history points under the guidelines for Mr. Wheat's juvenile adjudications, the juvenile history was the basis for the court's opinion that Mr. Wheat's criminal history was understated. (Sentencing Tr., R. 228, Page ID ## 2637, 2663.) The "persistent lawbreaking" reference by the district court consists of three juvenile convictions, the details of which are unknown, and a robbery when he was 18 years old. (Sentencing Tr., R. 228, Page ID # 2665; Sealed Presentence Investigation Report Revised, R. 199, Page ID ## 1438 – 1439.) The different due process standards in juvenile court and adult criminal court, in addition to the underlying policy of the juvenile court, make it clear that the use of juvenile adjudications to paint an adult as a bad actor is inappropriate and the upward adjustment was inappropriate.

ii.     **The court's concern for sentencing disparity is unwarranted and lead to an erroneous result.**

The sentencing court partially relied on the disparity between Mr. Wheat and his co-defendants – all of whom pleaded guilty - when applying an upward variance.

(Sentencing Tr., R. 228, Page ID # 2664.) This is a misapplication of 18 U.S.C. § 3553(e) and warrants reversal. This sentencing factor concerns *national* disparities between similarly situated defendants, not disparities among co-defendants. *See United States v. Carmichael*, 676 F. App'x 402, 411 (6th Cir. Jan. 13, 2017) (quoting *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008)). The sentencing guidelines were enacted to ensure national uniformity in federal sentencing proceedings and those guidelines "represent the best indication of national sentencing practices." *See Carmichael*, 676 F. App'x at 411 (quoting *United States v. Houston*, 529 F.3d 743, 752 (6th Cir. 2008)). When there is no concern for national uniformity, the court need not consider disparities between co-defendants. *See Conatser*, 514 F.3d at 521 (citing *United States v. Simmons*, 501 F.3d 620, 626 (6th Cir. 2007)). The sentencing determinations by the court place Mr. Wheat at offense level 14, which should be honored to further the policy goals of the federal sentencing guidelines.

Moreover, Mr. Wheat's culpability was substantially lower than the other defendants in this case. *See United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007) (holding that the disparity between the defendant's sentence and his co-defendant's sentences was warranted because the defendant filled a leadership role while his co-defendants were less involved in the conspiracy). Mr. Wheat was involved for two days and never supplied a large quantity of drugs to Mr. Reels. His actions were

substantially less intensive than his co-defendants, whose participation in Mr. Reels's scheme lasted several months.

For these reasons, the court improperly relied on sentencing disparity between co-defendants and Mr. Wheat's sentence should be vacated.

# **CONCLUSION**

For the foregoing reasons, the defendant respectfully requests this Honorable

Court of Appeals to vacate the judgement of conviction from the court below.

Respectfully submitted,

RITCHIE, DILLARD, DAVIES, & JOHNSON, P.C.

/s/Stephen Ross Johnson
STEPHEN ROSS JOHNSON (TN BPR #022140)
606 W. Main Street, Suite 300
Knoxville, TN 37902
(865) 637-0661
johnson@rddjlaw.com

*Counsel for William Wheat*

51

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation. I have checked the number of words in the applicable portions of this brief using Microsoft Word, and the report indicates that the countable portions of this brief under Rule 32(a)(7) contain less than 13,000 words.

/s/Stephen Ross Johnson
STEPHEN ROSS JOHNSON

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d), I hereby certify that a true and exact copy

of the forgoing was forwarded, via the Court's electrical filing ("ECF") system, this

27th day of July, 2020, to:

Ms. Laura McMullen Ford
Office of the U.S. Attorney
801 W. Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3817
Laura.Ford@usdoj.gov

/s/Stephen Ross Johnson
STEPHEN ROSS JOHNSON

# ADDENDUM

| ENTRY NO. | DESCRIPTION OF ENTRY | DATE | PAGE ID # RANGE |
|---|---|---|---|
| 8 | Indictment | 05/23/2018 | 42 – 43 |
| 21 | Superseding Indictment | 12/12/2018 | 78 – 95 |
| 125 | Exhibit List | 07/18/2019 | 768 – 770 |
| 127 | Verdict Form | 7/18/2019 | 772 – 773 |
| 129 | Parties Stipulations of Fact | 07/18/2019 | 778 – 781 |
| 131 | Judgment – Henry Williams | 07/23/2019 | 789 - 796 |
| 138 | Sealed Motion for Judgement of Acquittal | 07/31/2019 | 809 – 811 |
| 162 | Sealed Government Opposition to Defendant's Motion for Judgement of Acquittal | 09/20/2019 | 1069 – 1075 |
| 176 | Sealed Defendant's Reply to the Government's Opposition to Defendant's Motion for a Judgement of Acquittal | 10/04/2019 | 1205 – 1207 |
| 182 | Judgment – Otha Short | 10/09/2019 | 1295 - 1301 |
| 184 | Judgment – Donnell Bell | 10/09/2019 | 1306 - 1312 |
| 189 | Judgment – Andrew Thompson | 10/15/2019 | 1342 - 1348 |
| 197 | Judgment – Aaron Reels | 11/06/2019 | 1420 - 1426 |
| 199 | Sealed Presentence Investigation Report Revised | 11/14/2019 | 1431 – 1452 |
| 200 | Memorandum of Opinion and Order Denying 138 Sealed Motion | 11/15/19 | 1453 – 1459 |
| 201.1 | Government's Sentencing Memorandum | 11/16/2019 | 1463 – 1472 |
| 204 | Criminal Judgment | 11/21/2019 | 1515 – 1521 |
| 206 | Judgment – Carl Mileca | 11/21/2019 | 1526 - 1532 |
| 208 | Notice of Appeal | 11/29/2019 | 1537 – 1538 |
| 226 | Trial Transcript Vol. 2A | 03/16/2020 | 2184 – 2372 |
| 227 | Trial Transcript Vol. 3 | 03/16/2020 | 2373 – 2568 |
| 228 | Sentencing Transcript | 03/16/2020 | 2569 – 2680 |